T.C. Memo. 2017-226

UNITED STATES TAX COURT

ASIF SYED AND AMTUL SYED, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 30265-13.                          Filed November 16, 2017.

Robert K. Dowd, for petitioners.

Adam L. Flick, Audrey M. Morris, Vivian Bodey, Kimberly A. Kazda, and

Linda L. Wong, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

LAUBER, Judge:  With respect to petitioners' Federal income tax for 2009-

2011, the Internal Revenue Service (IRS or respondent) determined defici-

enciesand accuracy-related penalties under section 6662(a)[1] as follows:

---

[1]All statutory references are to the Internal Revenue Code (Code) in effect
(continued...)

[*2]

| Year | Deficiency | Penalty |
|------|-----------|---------|
| 2009 | $47,176 | $9,435 |
| 2010 | 68,171 | 13,634 |
| 2011 | 6,981 | 1,396 |

In a stipulation of settled issues filed February 17, 2016, the parties resolved a number of issues by mutual concession. The questions left for decision are whether petitioners: (1) qualify as real estate professionals under section 469(c)(7); (2) materially participated in certain loss-generating activities; and (3) are liable for accuracy-related penalties. We resolve these questions in respondent's favor.

FINDINGS OF FACT

At trial the parties filed a stipulation of facts with accompanying exhibits and a stipulation of settled issues, both of which are incorporated by this reference. Petitioners resided in Texas when they timely petitioned this Court.

Petitioner husband, Asif Syed (Dr. Syed), is a medical doctor specializing in urology. He was born in 1934 in India, where he studied medicine. He completed residencies in Canada and the United States and eventually established a urology practice in Dallas County, Texas.

_____

[1](...continued)
for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure. We round all monetary amounts to the nearest dollar.

[*3]   Before coming to Texas Dr. Syed and Mrs. Syed had three children.  During the early years of Dr. Syed's practice Mrs. Syed devoted her energies to raising their children.  After the children left for college, she began accompanying Dr. Syed to work.  She later became the office manager for the medical practice.

One of petitioners' sons, Nabeel Syed, also trained as a urologist and joined the family practice in 1997.  Shortly thereafter the practice hired a new office manager; although Mrs. Syed continued to accompany Dr. Syed to work, her formal duties thereafter were limited.  In 2006 the practice began outsourcing to an outside management company all back-office functions, including payroll processing, employee benefits, and insurance reimbursement.  This arrangement was well in place by 2009, the first tax year at issue.

Dr. Syed's practice consisted mostly of outpatient visits, though he devoted about one day a week to surgeries at local hospitals.  In 1999, soon after he turned 65, a tremor in his right hand forced him to reduce the number of major surgeries he performed, and his son Nabeel took those over.  But Dr. Syed continued to perform several different kinds of less invasive surgical procedures.

Dr. Syed has long had a close relationship with the Texas Regional Medical Center (Center).  He has been involved with the Center "from the time the foundation was laid to the time it became active," and he held a limited partnership inter-

**[*4]** est in it. By 2009 he had significantly reduced the number of surgeries he performed at the Center. But he testified that he had continued to engage in "consulting."

Petitioners offered no documentation (contemporaneous or otherwise) to substantiate how many hours Dr. Syed devoted to the Center. He testified that he spent "at least ten hours per week" there, but he offered no clear explanation as to how he got to that number. The only type of consulting to which he testified involved design of the Center's work space. But the Center had been in full operation for many years previously, and we did not find it plausible that he devoted meaningful hours during 2009 to consulting about work space design.

Petitioners formed a partnership called AAM Group, LLC (AAM), to hold two pieces of rental real estate: a commercial property in Dallas, Texas, and a single-family home in Richardson, Texas. Mrs. Syed performed several tasks relating to these properties, such as handling the bank account and occasionally meeting with contractors. She wrote six to eight checks per month on that account, but many of these checks were for charitable contributions unconnected with the real estate business. Many other checks were written to her son Hisham, who served as property manager for the commercial property; he devoted 16 hours a week to the property and was paid fees ranging from 16% to 54% of the gross

[*5] receipts. Mrs. Syed hired a landscape company to maintain the outdoor premises of the commercial property, and she hired contractors to do cleaning and make required repairs for both properties. The tenant of the commercial property credibly testified that he had never met either Mrs. Syed or Dr. Syed during the four years of his tenancy.

In 1989 petitioners formed Syed Family Limited Partnership (SFLP), in which Dr. Syed ultimately held the entire beneficial interest. Through SFLP they owned a ranch in Hunt County, about 50 miles north of their residence. They allegedly carried on haymaking and livestock activities through SFLP as well as a rental real estate activity through two subsidiary passthrough entities. Petitioners presented no evidence concerning SFLP's alleged rental real estate activity.

Petitioners regularly used the ranch as a weekend and vacation retreat. They testified that they had tried raising crops, apart from haymaking, on the ranch, and had investigated the possibility of raising animals; there is no evidence that they actually raised animals during 2009-2011. Virtually all of the actual work on the ranch was performed by laborers and hired contractors. Dr. Syed testified that he spent many hours reading magazines about animal husbandry, talking with other ranchers, and thinking about ranch matters. But petitioners presented no credible

**[*6]** evidence to substantiate the number of hours they devoted to actual farming or ranch tasks.

For each year at issue petitioners filed a timely Form 1040, U.S. Individual Income Tax Return, on which they sought to use flowthrough losses to shelter income earned from Dr. Syed's medical practice. All of those returns were prepared by a tax return preparation firm. Upon examination of those returns the IRS disallowed loss deductions as follows:

• For 2009 the Center had allocated to Dr. Syed, as a limited partner, a flowthrough loss of $51,331. Petitioners claimed this as a nonpassive loss deduction on Schedule E, Supplemental Income and Loss. The IRS recharacterized it as a passive loss under section 469(h)(2), determining that Dr. Syed had not materially participated in the partnership's loss-generating activity.

• For 2009, 2010, and 2011 petitioners claimed nonpassive loss deductions on Schedules E for two types of flowthrough losses from AAM. These consisted of ordinary business losses of $48,283, $84,390, and $16,520, respectively, and rental real estate losses of $42,076, $49,178, and $86,212, respectively. The IRS reclassified all of these losses as passive activity losses under section 469(c)(2), determining that petitioners were not real estate professionals and did not materially participate in the rental activities.

**[*7]**  • Petitioners claimed nonpassive loss deductions on Schedules E for two types of flowthrough losses from SFLP.  For 2009, 2010, and 2011 these consisted of ordinary business losses of $1,232, $167,144, and $15,547, respectively, attributable to their alleged haymaking and livestock activity.  (The figure for 2011 reflects a concession that petitioners made in the stipulation of settled issues.)  For 2010 they claimed a rental real estate loss deduction of $9,286 attributable to SFLP's alleged rental real estate activity.  The IRS recharacterized all losses from SFLP as passive activity losses under section 469(c)(1), determining that petitioners did not materially participate in the partnership's supposed livestock or farm activity or in its alleged rental real estate activity.

The IRS sent petitioners a timely notice of deficiency setting forth these adjustments.  It also determined accuracy-related penalties based on "substantial understatement[s] of income tax" under section 6662(d)(1)(A) and (alternatively) on negligence under section 6662(b)(1).  Petitioners timely petitioned this Court for redetermination of the deficiencies and penalties.

OPINION

The IRS' determinations in a notice of deficiency are generally presumed correct, and the taxpayer bears the burden of proving them erroneous.  Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933).  Deductions are a matter of

**[\*8]** legislative grace; the taxpayer bears the burden of proving his entitlement to deductions allowed by the Code and of substantiating the amounts underlying claimed deductions. INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992); sec. 1.6001-1(a), Income Tax Regs.

## I.     Burden of Proof

Under section 7491(a) the burden of proof may shift to the Commissioner if the taxpayer satisfies certain requirements. Section 7491(a)(1) requires the taxpayer to present "credible evidence" with respect to relevant factual issues. "Credible evidence" is evidence that, upon critical analysis, would constitute a sufficient basis for deciding the issue in the taxpayer's favor if no contrary evidence were submitted. Ocmulgee Fields, Inc. v. Commissioner, 132 T.C. 105, 114 (2009), aff'd, 613 F.3d 1360 (11th Cir. 2010); Higbee v. Commissioner, 116 T.C. 438, 442 (2001). Section 7491(a)(2) requires the taxpayer to comply with substantiation and recordkeeping requirements and cooperate with "reasonable requests by the Secretary for witnesses, information, documents, meetings, and interviews." Sec. 7491(a)(2)(A) and (B). The taxpayer bears the burden of proving satisfaction of these tests. See Rolfs v. Commissioner, 135 T.C. 471, 483 (2010), aff'd, 668 F.3d 888 (7th Cir. 2012).

**[\*9]** Petitioners have not met this burden. The "activity logs" and other documentation they submitted to substantiate their material participation were wholly inadequate. Petitioners' failure to cooperate with respondent's requests for information and documents forced respondent's counsel to serve formal discovery requests on several occasions. Because petitioners have not met the requirements of section 7491(a), they bear the burden of proof on all factual issues.[2]

## II.    Deductibility of Flowthrough Losses

Individual taxpayers may generally deduct, under sections 162 and 212 respectively, ordinary and necessary expenses paid or incurred in carrying on a trade or business or for the production of income. But the Code disallows any current deduction for a "passive activity" loss. Sec. 469(a)(1), (b). A "passive activity loss" is equal to the taxpayer's aggregate losses from all passive activities less his aggregate income from all such activities. Sec. 469(d)(1). Passive losses cannot be used to offset income from nonpassive activities, such as wage income. See Krukowski v. Commissioner, 279 F.3d 547, 549 (7th Cir. 2002), aff'g 114 T.C. 366 (2000).

---

[2]Even if respondent bore the burden of proof under section 7491(a), we would conclude that he met his burden by a preponderance of the evidence as to all relevant facts.

**[\*10]** A "passive activity" is a trade or business in which the taxpayer does not "materially participate." Sec. 469(c)(1)(B). "Material participation" requires regular, continuous, and substantial involvement in the business operations. Sec. 469(h)(1). Regulations provide seven disjunctive tests for what constitutes "material participation" in an activity. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988).[3] Section 469(b) allows passive loss deductions disallowed for one year to be carried over to the next year, generally on an activity-by-activity basis. See sec. 1.469-1T(f)(2)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5706 (Feb. 25, 1988).

A.    Flowthrough Loss From the Center

Dr. Syed admitted that his interest in the Center was that of a limited partner. Section 469(h)(2) provides: "Except as provided in regulations, no interest in a limited partnership as a limited partner shall be treated as an interest with respect to which a taxpayer materially participates." The regulations specify three situations in which an exception may apply, namely, where a limited partner shows: (1) participation in the activity for more than 500 hours during the tax year;

---

[3]These regulations, still in temporary form, were issued before November 20, 1988, the effective date of section 7805(e)(2). That section provides that "[a]ny temporary regulation shall expire within 3 years after the date of issuance of such regulation." See Technical and Miscellaneous Revenue Act of 1988, Pub. L. No. 100-647, sec. 6232(a), 102 Stat. at 3735.

**[\*11]** (2) material participation in the activity (under the general regulatory tests) for any 5 of the 10 preceding years; or (3) in the case of a personal service activity, material participation (under the general regulatory tests) for any 3 prior tax years. Sec. 1.469-5T(e)(1) and (2), Temporary Income Tax Regs., supra.

There is no evidence in the record quantifying Dr. Syed's participation in the Center's activities for any year before the tax years at issue. The second and third tests listed above accordingly have no application here. To be eligible for the limited partnership exception set forth in the regulations, therefore, petitioners must prove that Dr. Syed devoted more than 500 hours of participation to the Center's activities during 2009.

Petitioners have not met this burden. They offered no documentation (contemporaneous or otherwise) to substantiate how many hours Dr. Syed devoted to the Center during 2009. Although he testified that he did "consulting," the only type of consulting he mentioned involved design of the Center's work space. Because the Center had been in full operation for many years previously, we did not find it plausible that he devoted meaningful hours during 2009-2011 to consulting about work space design. He testified that he spent "at least ten hours per week" at the Center, but his testimony on this point was vague. He offered no clear ex-

**[\*12]** planation as to how he got to that number; we believe he chose it because it was the minimum number he needed to get to 500 hours per year.

All in all, we find that petitioners have failed to meet their burden of proving they satisfied the 500-hour annual requirement under the relevant regulatory test. The IRS thus correctly recharacterized petitioners' $51,331 flowthrough loss from the Center as a passive loss under section 469(h)(2).

B.  Flowthrough Losses From AAM

Section 469(c)(2) treats any "rental activity" as a passive activity regardless of the taxpayer's material participation unless the taxpayer was engaged in a "real property trade or business" during the relevant year. Sec. 469(c)(7)(C). Taxpayers who engage in a "real property trade or business" are often called "real estate professionals."

Petitioners insist that they were real estate professionals during 2009-2011 by virtue of the activities they conducted through AAM. If that were true, AAM's rental real estate activities, attributed to petitioners, would not be per se passive. See Kosonen v. Commissioner, T.C. Memo. 2000-107, 79 T.C.M. (CCH) 1765; sec. 1.469-9(b)(6), (c)(1), Income Tax Regs. And if petitioners "materially participated" in those activities, the activities would be treated as nonpassive, and the passive activity loss rule of section 469(a) would not apply. See Shiekh v. Com-

[*13] missioner, T.C. Memo. 2010-126; Fowler v. Commissioner, T.C. Memo. 2002-223; sec. 1.469-9(e)(1), Income Tax Regs.[4]

To qualify as a real estate professional, a taxpayer must (among other things) "perform[] more than 750 hours of services during the taxable year in real property trades or businesses in which * * * [she] materially participates." Sec. 469(c)(7)(B)(ii). If a taxpayer is married, activity by the taxpayer's spouse counts in determining "material participation" by the taxpayer. See sec. 1.469-5T(f)(3), Temporary Income Tax Regs., supra. But spousal attribution may not be used for the purpose of satisfying the 750-hour annual service requirement. Oderio v. Commissioner, T.C. Memo. 2014-39, 107 T.C.M. (CCH) 1214, 1215. Thus, at least one spouse must individually perform more than 750 hours of service in a real property trade or business.

Petitioners assert in their post-trial brief that "they spend more than 750 hours" annually on AAM's rental real estate activities. As noted above, however, at least one spouse must individually satisfy the 750-hour requirement. Consis-

---

[4]A taxpayer who is not a real estate professional, but who actively participates in a rental real estate activity, may deduct against ordinary income up to $25,000 of losses from that activity if adjusted gross income (AGI) is less than $150,000. Sec. 469(i)(1), (2), and (3). Because petitioners' AGI substantially exceeded $150,000 for each year at issue, they were ineligible to deduct losses under these provisions.

**[\*14]** tently with the trial testimony, petitioners state in their post-trial brief that Mrs. Syed "undertook primary responsibility" for AAM's rental real estate activities. We accordingly consider whether petitioners have proven that she met the 750-hour requirement.

A taxpayer may substantiate the required 750 hours of participation by any reasonable means, but a mere "ballpark guesstimate" will not suffice. Moss v. Commissioner, 135 T.C. 365, 369 (2010); sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. In the absence of "[c]ontemporaneous daily time reports, logs, or similar documents," the extent of participation may be established by "the identification of services performed over a period of time and the approximate number of hours spent performing such services * * * based on appointment books, calendars, or narrative summaries." Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., supra. The credibility of a taxpayer's records is diminished if the number of hours reported appears excessive in relation to the tasks described. Hill v. Commissioner, T.C. Memo. 2010-200, aff'd, 436 F. App'x 410 (5th Cir. 2011).

Mrs. Syed worked for Dr. Syed's medical practice as a full-time employee during 2009-2011. Although she had ceased functioning as the office manager, she accompanied Dr. Syed to work virtually every day and was paid for a 40-hour work week. Many of her hours at the office were "soft," but she was physically

[*15] present there most of the day. Dr. Syed fondly described their life-long partnership as "still going strong," noting how much it helped him to have her at the office "opposite me."

Petitioners' son Nabeel testified that Mrs. Syed was generally in the office whenever Dr. Syed was there. Although her substantive duties were limited, Nabeel wanted her there "to keep company for my dad and to see old patients." The onsite office manager confirmed that on most days petitioners arrived and left together, typically in the same car because Mrs. Syed did not drive. Her status as a full-time employee of the medical practice and her inability to drive a car significantly limited the number of hours she could devote to rental real estate activities.

The trial testimony established that Mrs. Syed performed several tasks relating to the two rental properties, such as handling the bank account, writing a few checks each month, and occasionally meeting with contractors. But petitioners produced no contemporaneous records to substantiate the number of hours these tasks entailed. The tenant of the commercial property credibly testified that he had never met Mrs. Syed or Dr. Syed during the four years of his tenancy. This fact alone suggests that their personal involvement was not great.

The evidence showed that most of the required work was in fact done by other people. For the commercial property, AAM paid property management fees

**[\*16]** (ranging from 16% to 54% of gross receipts) to petitioners' son Hisham, who devoted 16 hours a week to that property annually. Mrs. Syed hired a landscape company to maintain the outdoor premises of the commercial property, and she hired contractors to do cleaning and make required repairs for both properties.

For the residential property, a single-family home, AAM reported minimal rent receipts, suggesting long periods of vacancies. (Rental income did not exceed $2,200 for any year at issue.) Mrs. Syed testified that she had advertised the property and tried to find tenants, but petitioners provided no documentation to substantiate the volume of her appointments or actual showing dates.

Petitioners submitted at trial a spreadsheet listing various real-estate-related tasks they supposedly performed, allegedly consuming in excess of 1,000 hours per year. But this list was supported by no contemporaneous records, and we did not find it credible; it is the sort of uncorroborated "ballpark guesstimate" that we have found inadequate on prior occasions. See Lee v. Commissioner, T.C. Memo. 2006-193; Goshorn v. Commissioner, T.C. Memo. 1993-578. Petitioners created this list during the IRS examination or before trial with an end result in mind: to show a certain number of hours of time devoted to rental properties. We have previously found such lists unpersuasive, and our conclusion is the same here.

[*17] See, e.g., Mowafi v. Commissioner, T.C. Memo. 2001-111; Goshorn, T.C. Memo. 1993-578.

Both Mrs. Syed and Dr. Syed were full-time employees of the medical practice during the tax years at issue. We conclude that neither of them has substantiated, for 2009, 2010, or 2011, the performance of more than 750 hours of services in connection with AAM's rental real estate activities. Petitioners have thus failed to establish their status as real estate professionals under section 469(c)(7). The losses passed through to them from AAM are therefore passive losses that cannot be used to offset their ordinary income.[5]

## C. Flowthrough Losses From SFLP

Through SFLP petitioners owned a ranch in Hunt County, Texas, about 50 miles from their residence. Dr. Syed testified that he raised goats, emus, and other animals on the ranch, but he was unable to specify in which tax years he began

---

[5]Even if petitioners were "real estate professionals," they would still have to establish that they "materially participated" in AAM's rental real estate activity. Where (as here) multiple rental properties are involved, material participation is tested separately with respect to each property unless the taxpayer has elected to treat all of the properties as a single activity. Sec. 469(c)(7)(A); Aragona Tr. v. Commissioner, 142 T.C. 165, 181 n.17 (2014). A taxpayer makes this election by filing a statement with his original tax return for the first year he elects to treat multiple rental properties as one. See sec. 1.469-9(g)(3), Income Tax Regs. Petitioners concede that they did not make this election. Given their lack of credible time records, they could not possibly establish material participation with respect to the two properties separately.

[*18] raising those animals. SFLP's tax returns for 2009-2011 do not list any livestock as assets, and petitioners introduced no documentary evidence to substantiate the purchase or sale of livestock. At one point, Dr. Syed indicated that livestock activity on the ranch did not occur until 2012 or 2013.

For 2009-2011 SFLP attached to its Forms 1065 Schedules F, Profit or Loss From Farming. These schedules showed net farm losses, which flowed through to petitioners and were reported on their Schedules E. Through two other pass-through entities, SFLP also seems to have held rental real estate, at least in 2011. But petitioners introduced no evidence concerning the nature of that activity or their role in it.

Petitioners assert that Dr. Syed was able to "materially participate" in the ranch activity because he had largely wound down his medical practice by 2009. But his employment contract designated him a full-time employee during the tax years at issue and required that he maintain an office schedule of at least 32 hours a week. A senior official of the practice's management company, upon a review of billing data, concluded that Dr. Syed saw an average of 200 patients a month in 2009, 155 patients a month in 2010, and 150 patients a month in 2011. Petitioners' son Nabeel, who had been with the practice for a decade, provided roughly

[*19] consistent testimony, estimating that his father saw up to 35 patients a week and spent 30 to 40 minutes with each.

The onsite office manager for the medical practice characterized Dr. Syed's schedule during the tax years at issue as "tough," testifying that it was rare for him to leave the office before 4:30 p.m. She credibly testified that he did not cut back his hours until 2013 or 2014, when he neared retirement. His wage income from the practice--$193,261 in 2009, $232,967 in 2010, and $179,185 in 2011--is consistent with a relatively full-time schedule. Dr. Syed's full-time employment as a doctor makes us skeptical that he could have "materially participated" in SFLP's ranch activity.

In any event, petitioners produced no contemporaneous records to substantiate the extent of Dr. Syed's ranch activity participation. Virtually all of the actual work on the ranch was performed by laborers and hired contractors. Dr. Syed testified that he did research before embarking on raising livestock, but this type of work does not count as direct involvement in the day-to-day operations of a trade or business and thus does not count toward satisfying the material participation requirement. See, e.g., Serenbetz v. Commissioner, T.C. Memo. 1996-510; Goshorn, T.C. Memo. 1993-578. He also claimed to have taken part in the branding and registration of cattle. But there is no evidence in the record that SFLP's

[*20] ranch had any registered cattle brand during the tax years at issue. The ranch did register a brand for its cattle in Hunt County, but that was not until January 2016, well after the tax years at issue.

Petitioners argue that they materially participated in SFLP's ranch operations under the last two of the seven disjunctive regulatory tests. See sec. 1.469-5T(a)(1) through (7), Temporary Income Tax Regs., supra. We therefore deem petitioners to have conceded any argument based on the first five tests. See Rybak v. Commissioner, 91 T.C. 524, 566 n.19 (1988). The sixth regulatory test relates to "personal service" activities, and the seventh test mandates a "facts and circumstances" inquiry. See sec. 1.469-5T(a)(6) and (7), Temporary Income Tax Regs., supra.

A "personal service activity" encompasses certain enumerated activities and any "other trade or business in which capital is not a material income-producing factor." Id. para. (d). Capital is a material income-producing factor if a substantial portion of the gross income from the activity is attributable to the employment of capital. See, e.g., Moore v. Commissioner, 71 T.C. 533 (1979). When it comes to ranching, "the quality of the land, the efficiency of the machinery, and the development of the cattle [a]re critical to its success." Woodbury v. Commissioner,

[*21] 49 T.C. 180, 191 (1967).  Because capital is a material income-producing factor for a ranching business, it is not a "personal service activity."[6]

Under the "facts and circumstances" test, an individual will be regarded as materially participating in an activity if, "[b]ased on all of the facts and circumstances * * * , the individual participates in the activity on a regular, continuous, and substantial basis during such year."  Sec. 1.469-5T(a)(7), Temporary Income Tax Regs., supra.  Generally speaking, "[a]n individual's services performed in the management of an activity shall not be taken into account in determining whether such individual is treated as materially participating."  Id. para. (b)(2)(ii).  In no event shall an individual be deemed to materially participate if he "participates in an activity for 100 hours or less during the taxable year."  Id. subdiv. (iii).

We find that petitioners, under all the facts and circumstances, did not participate in the ranch activity "on a regular, continuous, and substantial basis" during 2009, 2010, or 2011.  Id. para. (a)(7).  At trial they submitted an exhibit listing SFLP-related tasks they supposedly performed, coming up with bottom-line numbers of 10 to 15 hours per week.  These estimates were supported by no contem-

---

[6]Even if the ranch activity were deemed a "personal service activity," the regulations (subject to an exception not applicable here) require the taxpayer to have participated in it for three years before the year at issue.  Sec. 1.469-5T(a)(6), Temporary Income Tax Regs., supra.  Petitioners introduced no evidence about material participation for years before 2009.

**[*22]** poraneous records, and we did not find them credible. See Bartlett v. Commissioner, T.C. Memo. 2013-182. Both petitioners were full-time employees of the medical practice; they visited the ranch on weekends, chiefly for personal reasons. Dr. Syed was 75 years old by 2009. He conceded that most of the time he devoted to the ranch consisted of reading, talking, and thinking, whereas all the actual ranch and farm work was done by laborers and contractors.

Upon a careful review of all the facts in the record, we conclude that neither petitioner materially participated in the ranch activity under the "facts and circumstances" test. The losses passed through to them from SFLP are therefore passive activity losses that cannot be used to offset their ordinary income.[7]

## III. Accuracy-Related Penalties

The Code imposes a 20% penalty upon the portion of any underpayment of income tax that is attributable (among other things) to "negligence" or any "substantial understatement of income tax." Sec. 6662(a) and (b)(1) and (2). "Negligence" is defined as "any failure to make a reasonable attempt to comply" with the provisions of the Code. See sec. 6662(c). An understatement of income tax is

---

[7]Petitioners offered no testimony or documentary evidence concerning the rental real estate activities that SFLP allegedly conducted through two subsidiary passthrough entities. We have determined that petitioners were not "real estate professionals," and we deem them to have conceded that they did not materially participate in any rental real estate activity conducted through SFLP.

**[\*23]** "substantial" if it exceeds the greater of $5,000 or 10% of the tax required to be shown on the return.  See sec. 6662(d)(1)(A).  Invoking both grounds in the alternative, the notice of deficiency determined an accuracy-related penalty on the full amount of the deficiency for each year.

Under section 7491(c) the Commissioner bears the burden of production with respect to the liability of an individual for any penalty.  See Higbee, 116 T.C. at 446.  Respondent has carried that burden here:  He has shown that petitioners were not real estate professionals; that they did not materially participate in any loss-generating activities; and that all claimed loss deductions were in fact passive.

No penalty is imposed with respect to any portion of an underpayment if the taxpayer acted with reasonable cause and in good faith with respect thereto.  Sec. 6664(c).  The taxpayer bears the burden of proving reasonable cause and good faith.  Higbee, 116 T.C. at 444-447.  Reasonable cause can be shown by good-faith reliance on the advice of a qualified tax professional.  Sec. 1.6664-4(b)(1), (c), Income Tax Regs.  Whether the taxpayer actually relies on the advice and whether such reliance is reasonable present questions of fact.  Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002); sec. 1.6664-4(c)(1), Income Tax Regs.  For reliance to be reasonable,

[*24] the taxpayer must prove (among other things) that he provided "necessary and accurate information to the adviser." Neonatology Assocs., P.A., 115 T.C. at 99.

Petitioners have failed to establish that they made a good-faith effort to determine their Federal income tax liabilities correctly. Although they hired a tax return preparer, they presented no credible evidence regarding what (if any) records they provided to their preparer to substantiate the nonpassive character of their flowthrough losses. See Bartlett, T.C. Memo. 2013-182. Nor have they shown that their return preparer was competent. They did not call her as a witness, and her unquestioning acceptance of their losses as nonpassive, in the absence of any contemporaneous participation records, does not inspire confidence.

We therefore conclude that all of the underpayments (as redetermined) are attributable to negligence. Alternatively, if the Rule 155 computations show that the various understatements of income tax exceed the greater of $5,000 or 10% of the amounts required to be shown on the respective returns, we conclude that those underpayments are attributable to substantial understatements of income tax for which reasonable cause has not been shown.

**[\*25]** To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.