T.C. Memo. 2018-136

UNITED STATES TAX COURT

SCOTT A. HOUSEHOLDER AND DEBRA A. HOUSEHOLDER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 19150-10, 6541-12.          Filed August 23, 2018.

<u>Kacie N.C. Dillon</u> and <u>Tim Alan Tarter</u>, for petitioners.

<u>Michael R. Harrel</u>, <u>Doreen Marie Susi</u>, <u>John R. Gordon</u>, and <u>Brandon Keim</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

HOLMES, <u>Judge</u>:  Scott and Debra Householder deducted $1.3 million in losses for amounts they paid to ClassicStar, a horse-leasing operation that turned out to be a scam.  They say they should still get the losses because they materially

**[*2]** participated in the trade or business of breeding horses.  The Commissioner

disagrees--he thinks they were in it only for the losses.

FINDINGS OF FACT

I.      Background

A.      Scott and Debra[1]

Scott Householder had an MBA with an emphasis in finance and ten years

of experience as a financial adviser with American Express when he founded

Householder Group in 1997.  Householder Group is a financial advisory firm that

earns fees and commissions for selling investments.  It is also phenomenally

successful, and by 1998 was the fastest growing affiliate of Sun America

Securities.  Today it has more than forty offices.

Scott's wife Debra always liked horses.  She started taking riding lessons

when she was nine, showed horses in neighboring states by the time she was

fourteen, and showed nationally for a time after high school, hauling her horse

Brandy Susie Bar with a truck and trailer that her dad bought her.  During college

she had internships where she gave riding lessons, trained horses, and participated

---

[1] The record shows that Debra sometimes goes by Householder and sometimes by Davis, her maiden name.  To avoid confusion, we will sometimes use the Householders' first names.

[*3] in the day-to-day aspects of horse breeding--which included artificially inseminating mares.

Debra moved to Colorado when she was 24 and worked for a tour company. There she met Scott, and in the decades that followed she raised three children and went to graduate school. She earned a Ph.D., and in 2011 she became a licensed psychologist.

But even with all their education and obvious intelligence, the Householders got a big surprise when their accountant drafted their 2001 tax return--an extra $466,000 in income from Sun America. This wasn't sitting in their bank account, but was instead cancellation of indebtedness (COI) income. In their case, the debt Sun America canceled was part of the money Scott had borrowed to start his business, and Sun America forgave the loan because Householder Group had more than met certain performance goals. This COI significantly increased Scott and Debra's taxable income, and Householder Group's success meant there would be more to come in later years.

B.   ClassicStar

Enter Bob Holt, a friend of Scott from his days at American Express. Holt sold investments on commission for Private Consulting Group (PCG), and in February 2002 he pitched one to Scott and Debra--ClassicStar's thoroughbred

**[\*4]** mare-leasing and breeding program. He showed Scott ClassicStar's marketing materials, which included ostensibly independent tax opinions. It was a private-placement program, which means it was not offered to the general public.

The program seemed simple. Participants leased mares from ClassicStar, paid for their board and stud fees to breed them, and owned any foals that resulted. Thoroughbreds are usually bred between February and June and have eleven-month gestation periods, so a single breeding cycle usually stretches across two calendar years. Participants in ClassicStar would pre-pay (mostly with borrowed money) all of the expenses in the year before the mare became pregnant. This would generate net operating losses (NOLs) for that year that participants could carry back to even earlier years. And if they sold a foal when it was a "yearling"--meaning when it was around a year old--any income would be capital.

ClassicStar had a lender lined up for its clients--the National Equine Lending Company (NELC). ClassicStar recommended taking out both "short-term financing" for about 40% of the total cost--which participants would pay back with money from their tax refunds--and "long-term financing" for 50% of the total cost. These loans were secured by the expected foals. ClassicStar said it had "arranged" for the NELC financing, but in reality ClassicStar and NELC were commonly controlled--ClassicStar president S. David Plummer III's brother-in-

[*5] law, Gary Thompson, ran NELC; all of NELC's business was with ClassicStar; and ClassicStar gave NELC the money to fund the loans, though NELC sometimes returned it the next day.

Scott and Debra testified that they didn't know ClassicStar and NELC were related. But correspondence they received from both ClassicStar and NELC's loan servicer said to direct any questions to Terry Green, who was both ClassicStar's CPA and a member of the firm that serviced the loans. Green also spoke at a ClassicStar event that Scott attended, and even sent Scott and Debra a letter on NELC letterhead.

ClassicStar also offered participants the option of converting their mare-leasing interests into stakes in two related entities--First Equine Energy Partners (FEEP) and Gastar Exploration (Gastar).[2] Gastar securities are publicly traded,[3] but FEEP was another private-placement program that claimed to hold interests in both horses and coal-bed methane gas properties. And FEEP's private-

---

[2] The record refers to both Gastar Exploration, Ltd., and Gastar Exploration, Inc. The Commissioner says these are the same entity at different times, and Scott and Debra don't disagree.

[3] Gastar's 2005 annual report says it's traded on the Toronto and American Stock Exchanges, and the parties introduced into evidence a table of its historic trading prices.

**[\*6]** placement memorandum explained that NELC would accept FEEP units as substitute collateral for the outstanding loans.

ClassicStar participants have been to our Court before. See generally Raifman v. Commissioner, T.C. Memo. 2018-101 (tax-avoidance-motivated participation); Romanowski v. Commissioner, T.C. Memo. 2013-55 (activity not engaged in for profit); Pederson v. Commissioner, T.C. Memo. 2013-54 (same); Van Wickler v. Commissioner, T.C. Memo. 2011-196 (not carrying on trade or business and expenses unreasonable). We've also encountered Holt before. See generally Goyak v. Commissioner, T.C. Memo. 2012-13 (contribution to PCG-pitched employee benefit plan not deductible).

C.    Scott and Debra Sign Up

Back in 2002, however, this all sounded great to Scott and Debra. They sent Holt their recent tax returns, which he said he needed to determine that they were qualified investors. In May 2002 Holt sent them a proposed "Mare Lease and Breeding Activity" report that began with a table labeled "potential net operating loss." That table showed an "NOL needed" of $1.9 million--needed because it matched the amount of taxable income the report said Scott and Debra had from 1997 to 2002. The report also explained that "[u]nder recent signed legislation, Net Operating Losses can be carried back five (5) years" and

**[*7]** "Agricultural Mare Lease Deductions are not subject to Alternative Minimum Tax (AMT)." It then laid out a plan to generate a "total mare leasing and breeding loss" of $1.9 million and described how to later convert the mare-leasing interest into a "methane gas working interest," convert that interest into common stock, and then sell it for a capital gain.

In September 2002 the Householders signed both a letter of intent to participate in ClassicStar's mare-leasing program and a confidentiality agreement. Debra wrote ClassicStar a check for $100,000, and ClassicStar gave them a revised mare-leasing program report. The first page of this revised report showed an $819,000 "NOL needed," which was the amount of taxable income the report said Scott and Debra would have in 2002 alone. It also had more detailed information about how to convert interests into Gastar stock and exit the program, which included a "strategy timeline" that showed a purchase in 2002 and a liquidation in 2006. That report listed a "put" price for Gastar stock of $3 per share, but also included calculations for "probable" and "potential" share prices of $6 and $10.

Scott and Debra attended ClassicStar's "Breeders' Cup Weekend" in Kentucky in October, which featured a dinner party with a "Hawaiian theme" and the "4th Annual ClassicStar Breeders' Cup Eve Gala Party." There they could

[*8] hear presentations by Tony Ferguson, who was ClassicStar's chairman and Gastar's executive vice president, and David Plummer.

### D. Correspondence from ClassicStar

During the next few months ClassicStar sent Scott and Debra several letters. One had the subject "2002 ClassicStar Mare Lease Program--Financing." It read in part: "ClassicStar has arranged with National Equine Lending Company to provide the Short-term Financing (Tax Refund), which is approximately 40% of the Mare Lease Program. The loan will mature June 1, 2003. It is very important that the client files his/her tax return in a timely manner."

A letter dated October 31, 2002, explained that "[t]o obtain the full tax benefits of the program * * * [participants] must spend a minimum of 100 hours" per year participating on a "continuous, regular and substantial basis," and it suggested they record their participation in a journal. It also recommended opening a checking account for the "equine business" and creating either an S

[*9] corporation[4] or an LLC,[5] which Scott and Debra did--in December they
formed an LLC called Medaca Investments (Medaca) and the following year they
transferred all of their mare-leasing interests to it.  They also used Medaca's
checking account to pay unrelated expenses, such as utility bills and their monthly
payment on a Land Rover.

A November 26, 2002, email from ClassicStar's VP of operations Jennifer
Stahle reiterated that the Householders needed to show regular, continuous, and
substantial participation in order to claim losses.  That email had an attachment
which listed various ClassicStar activities that could count as participation--
including "WebEx Conference Call[s]," meeting with David Plummer, touring
ClassicStar facilities, and even watching horse races on TV.  And a letter dated
December 12, 2002, began with "[e]nclosed is the compiled material and

---

[4] An S corporation is a business that meets the requirements of section 1361
and elects to have its income and losses flow through to its shareholders without
paying corporate tax.  See secs. 1362(a), 1363(a) and (b).  (All section references
are to the Internal Revenue Code in effect for the years at issue, and all Rule
references are to the Tax Court Rules of Practice and Procedure, unless otherwise
indicated.)

[5] LLC stands for "limited liability company," a hybrid form of business
entity that shares some of the characteristics of a partnership and some of the
characteristics of a corporation.  Unless it elects to be taxed as a corporation, an
LLC's profits and losses "pass through" to its owners, who are called members.
See sec. 301.7701-3(a) and (b)(1), Proced. & Admin. Regs.

**[\*10]** information you requested" and explained how to get discounted subscriptions to the magazines "The Blood-Horse" and "Thoroughbred Times."

### E.    Stallworthy

Scott and Debra tried to get their CPA, Margaret Stallworthy, involved. She told them that she wasn't qualified to give an opinion about ClassicStar's horse-breeding program, but she did explain that the IRS might consider it an active investment, a passive investment, or even a hobby depending on "how well * * * [Scott and Debra] could document the level of their participation and expertise."

At Scott's urging Stallworthy met with Holt in November 2002. Holt showed her a marketing brochure for ClassicStar, which she thought "was clearly an investment for high net worth individuals." Holt also brought a private offering memorandum to the meeting, but he refused to show it to Stallworthy because she wouldn't sign a nondisclosure agreement. Her only followup from the meeting was to tell Holt that Scott and Debra's 2002 taxable income would be between $810,000 and $830,000.

[*11] II.     Mare Leasing

    A.     The 2002 Program

        1.     The Paperwork

On December 21, 2002, Scott and Debra signed a "mare lease and breeding agreement" that said they "desire[d] to lease from * * * [ClassicStar] the mare or mares selected by * * * [Scott and Debra] on the attached schedule A."  But there was no schedule A attached to the agreement--or anywhere else.  At trial the Householders' own expert said that horse breeders don't usually sign agreements without knowing what horses are involved, which the Commissioner's expert explained is so because the characteristics of the specific horses are what determine whether a breeding operation will be successful.  This seems so obvious that an expert shouldn't be necessary to support a finding that it's true, but we'll just find their testimony credible on this point.  No matter--Scott gave ClassicStar a check for $226,000, and Debra gave one for $50.

Debra testified that there was a "verbal [i.e., oral] schedule A" because she told Spencer Plummer--David Plummer's son[6]--which mares she wanted to lease and which stallions she wanted to breed them with.  She claims she picked seven

---

[6] Other ClassicStar employees included Shane Plummer and Nick Plummer. ClassicStar appears to have been a family business.

- 12 -

**[*12]** pairings and expected she would get three or four of them. But the agreement Debra and Scott signed said: "This Agreement shall constitute the entire agreement between the parties and any prior understanding or representation, both written and oral, of any kind preceding the date of this Agreement shall not be binding upon either party except to the extent incorporated in this Agreement." It also said that any subsequent modification was binding only if it was in writing. So, regardless of what Debra did or didn't discuss with ClassicStar before signing this agreement--and we're not convinced that she discussed anything--she paid hundreds of thousands of dollars to breed horses without knowing which horses were to be bred.

Scott and Debra also signed three other agreements with ClassicStar. One was a boarding agreement in which they hired ClassicStar "to board and care for the mare or mares described on the attached schedule A"--though this agreement lacked a schedule A as well. A second agreement made ClassicStar the nominee for "the foals set forth on Exhibit A attached," on which each space where foals and their parents should have been listed was blank. The third agreement said ClassicStar agreed to board "[f]oals identified on Exhibit A, which is attached," but once again there was no Exhibit A.

[*13] On, or within days of, signing these riderless agreements, Scott and Debra took out a $75,000 short-term loan and a $401,000 long-term loan with NELC. They also executed a revised letter of intent that listed the $100,000 Debra had paid in September, the $226,000 that Scott and Debra had paid that month, the $75,000 funded by the short-term loan, and the $401,000 funded by the long-term loan--for a total of $802,000.

In early February 2003 ClassicStar sent the Householders a letter to remind them that the sooner they filed their tax return and received their refund, the sooner they could pay off their short-term loan. It also said that Jennifer Stahle--who signed the letter--and Terry Green were available to answer any questions. And later Shane Plummer sent them a timeline reminding them that they should "[l]og at least 100 hours of Material Participation before December 31."

2.     The Breeding Season

The actual breeding for the 2002 breeding program should have happened in early 2003. ClassicStar's materials said that pregnancy checks would be performed 17 and 28 days after breeding and that the unknown foals' sexes would be determined at 62 days. But ClassicStar didn't tell Scott and Debra whether any pregnancies had begun, or anything else about their mares--and neither of them ever asked.

**[*14]**    3.    <u>Trips</u>

a.    <u>The 2003 Kentucky Derby</u>

In May 2003 Scott and Debra traveled to Kentucky for ClassicStar's "exclusive" Kentucky Derby weekend, where they went on tours, had dinners, and mingled with other ClassicStar clients. Debra said that during that trip she received a written schedule that purported to list the mares she and Scott had leased for the 2002 program. Debra said she never saw it again after the trip, and it wasn't produced at trial. According to her, it listed pairings, some of which included quarter horses--which are generally less expensive than thoroughbreds and cost much less to breed. Debra says Spencer Plummer told her the quarter horses were "placeholders"--a practice Debra said she'd heard about during her internships but which we specifically find is not common in the horse-breeding industry. Scott said he thought the reason ClassicStar hadn't told Debra and him which horses they'd paid to breed even by the end of the breeding season was that it was "administratively challenged."

Debra also testified that during the 2003 Kentucky Derby trip ClassicStar paraded a thoroughbred mare named GoGo past its clients and announced that Scott and Debra Householder had selected her. This surprised her because she had researched GoGo when she looked up ClassicStar's horses, wasn't interested in

[*15] her, and didn't select her. But there was something else even odder about GoGo--ClassicStar didn't own her in May 2003. It bought her only in November 2003 at the Keeneland sale (perhaps the premiere thoroughbred auction); and when it bought her, she was already pregnant by a stallion called Mr. Greeley.

### b.     Yellowstone and the Virgin Islands

At the end of July Scott and Debra went on another ClassicStar trip--this time to David Plummer's house near Yellowstone. They met there with "other ClassicStar owners," participated in "[a]fternoon activities," and discussed FEEP.

Yellowstone was Debra's last ClassicStar trip for 2003, but Scott made one more--to the U.S. Virgin Islands. Scott had to pay his own way to Tampa, where he met with Tony Ferguson. From there on, ClassicStar paid his expenses. The agenda included talks by David Plummer, Tony Ferguson, and Terry Green--who spoke about material-participation logs. It also included golf, shopping, gambling, and cocktails.

### B.     The 2003 Program

By August 2003 Scott and Debra still hadn't received any updates about the 2002 breeding program, but that month they nevertheless executed on behalf of Medaca a letter of intent to participate in the 2003 program. After handwriting some adjustments to the numbers typed on the letter, they said they would pay

**[*16]** $500,000--which was also the "NOL needed" on an October 28, 2003, report they received from ClassicStar. That report showed that $200,000 would be from "Tax savings and refunds," $250,000 would be from a loan, and $50,000 would be a downpayment from the lessee. In November Scott paid ClassicStar the $50,000 with a check from Medaca. Scott and Debra also got a $200,000 "short-term" loan and a $250,000 "long-term" loan from NELC.

A month later in December 2003 Scott and Debra--again on behalf of Medaca--executed a Mare Lease and Breeding Agreement, a boarding agreement, a foal agreement, and a nominee agreement, all for the 2003 program. These again referred to a schedule A that was supposed to show the specific mares and stallions to be bred. There actually was a schedule A for this program--although it's undated.

That schedule A lists five pairings for a total cost of $500,000, but only one of the horses is a thoroughbred--GoGo, the mare Debra says she saw at ClassicStar's 2003 Kentucky Derby weekend. The schedule A paired GoGo with a cutting horse--a less-expensive type of horse--for a "breed fee" of $10,000, even though his normal stud fee was only $2,500. The other listed horses were all quarter horses, and one of the horses in the mare column was actually a gelding--a male horse that had been castrated. The listed pairings were therefore worth much

[*17] less than what the Householders paid, and at least one couldn't have produced a foal.

Scott and Debra nevertheless signed this schedule A.

As with the 2002 program, Scott and Debra neither received nor asked for any updates about the leased mares' pregnancies.

### C.     The 2004 Program

In May 2004 Scott and Debra signed up for a third year, again planning to generate $500,000 in NOLs.  They paid half themselves--$100,000 with a check from Medaca in May and $150,000 with a check from the Householder Group in September.  But they later backed out of the 2004 program, and ClassicStar refunded their $250,000 in November 2004.

### D.     Cashing Out

On May 24, 2004--three days after they'd signed up for the 2004 program--Scott and Debra told ClassicStar's parent company GeoStar that they wanted to exchange part of their "Mare Lease Breeding * * * Business" for a "working interest" in GeoStar's "2004 Coalbed Methane Drilling Program."  In November 2004 they traveled with Holt and his wife to a Gastar property in Australia, and on the last day of 2004 exchanged the majority of their interest in the 2002 breeding program and their entire interest in the 2003 breeding program for units of FEEP

[*18] and shares of Gastar. They got 797,000 FEEP units--which their subscription documents valued at $1 each--and 75,000 Gastar shares--which were trading for $16 a share, but which the purchase agreements valued at $3 each, same as the "put" price on the initial mare-lease program reports they'd received. These shares came with the restriction that Scott and Debra couldn't sell them for one year without Gastar's permission.

In February 2007 Scott and Debra gave all 797,000 of their FEEP units to NELC in satisfaction of the $400,000 long-term loan from 2002 and the $250,000 long-term loan from 2003.

E. Phoenix Heat

Although they'd supposedly paid for multiple horse pairings in 2002 and 2003, Scott and Debra received only one foal--Phoenix Heat. Phoenix Heat was born in February 2004, and ClassicStar had purchased her mother in foal at the Keeneland sale in November 2003. Debra saw Phoenix Heat for the first time during ClassicStar's Kentucky Derby weekend in May 2005. The foal had some problems--it was pigeon toed and had "parrot mouth" (basically an overbite)--that Scott and Debra spent $1,600 to correct. Debra put Phoenix Heat up for auction at the November 2005 Keeneland sale, during which she signaled Nick Plummer to

[*19] place bids on her behalf in order to drive up the price. Phoenix Heat sold for $200,000, from which Scott and Debra got $180,000 after a commission.

F.    ClassicStar's Demise

The IRS raided ClassicStar's offices in February 2006. In October 2009, David Plummer, Spencer Plummer, and Terry Green each pleaded guilty to conspiring to defraud the United States by impairing and impeding the Internal Revenue Service with ClassicStar's mare-leasing program. During the plea hearing, David Plummer admitted he'd helped people take tax deductions they weren't entitled to; Spencer Plummer admitted that the NELC loans were the source of the deductions, that ClassicStar didn't own enough mares for its program, and that FEEP interests were worthless; and Terry Green said he'd helped people under audit provide misleading and back-dated documents to the IRS.

ClassicStar itself collapsed into bankruptcy. In November 2007 Scott and Debra filed a proof of claim for $4.7 million--which included the $250,000 Scott paid for the 2004 program that ClassicStar had refunded in November 2004.[7] The bankruptcy court reduced their claim by the $1.9 million they'd listed for

---

[7] The $4.7 million figure also double counted the amount Scott and Debra paid ClassicStar by adding separate lines for out-of-pocket and borrowed money paid with a line for "total program."

[*20] "Assessed, Paid, and Expected Tax/Penalties/Interest (2001-2009)" and "Estimated tax for debt forgiveness,"[8] and they ultimately received $23,000 from the bankruptcy trustee. Scott said he didn't sue Holt--although Holt's other clients did--because he didn't think Holt had stolen from him, and he didn't sue ClassicStar because he didn't think he'd get any money back.

### III.    The Householders' Tax Returns

#### A.    2001

The Householders' CPA prepared all their returns. The amended 2001 joint tax return that Scott and Debra filed in November 2002 showed almost $900,000 in adjusted gross income (AGI), which included the $400,000 COI income from Sun America, and a tax liability of $308,000. But in 2004 they filed a second amended return, on which they reduced their AGI to under $400,000. The adjustment included a $37,000 NOL carryback from 2003.

#### B.    2002

ClassicStar emailed Holt instructions on how Scott and Debra should fill out the Schedule F, Profit or Loss from Farming, on their 2002 tax return. It said:

---

[8] It also reduced their claim by the $180,000 they'd received for the sale of Phoenix Heat, although they'd already shown that amount as "cash received" on their initial claim.

| Board and mare care expenses | $45,000--line 18 |
|---|---|
| Board fees | 212,000--line 33 |
| Mare lease | 440,340--line 26b |
| Insurance | 104,600--line 22 |
| Total expenses | 801,940--line 36 |

Scott gave these instructions to Stallworthy and told her to follow them. After Scott assured her that he and Debra had really participated in a business, Stallworthy transcribed the numbers from the email onto the Schedule F. Although Scott and Debra had around $771,000 in wage, business, and Schedule E income, the AGI they reported for 2002 was a loss of $4,800.

C.     2003

On their 2003 tax return Scott and Debra reported $515,000 in Schedule F losses related to their involvement with ClassicStar. This made their 2003 AGI negative and created the NOL carryback they reported on their amended 2001 return.

IV.   The Audit

A.     Debra's Notebook

The Commissioner began an audit in 2005. In November of that year a revenue agent met with Debra and asked her for the names of the horses she'd

[*22] leased. Debra couldn't name any. And even at trial Scott said he had no idea how many pairings he'd paid for or which mares he'd leased.

During the audit, the agent repeatedly asked Scott and Debra to turn over any documents showing their due diligence and the horses involved. They never did send any original documents in response to these requests, but in 2007 they gave the revenue agent a document labeled "Householder Outline of Facts" that listed "Original Pairings" and "Trade Out[s]" for the 2002 and 2003 programs. Several of the horses listed were also quarter horses--including some listed after the trade-outs.

Despite not producing any original documents during the years-long audit, a few weeks before trial the Householders turned over a coverless spiral notebook full of handwritten notes they say Debra made between 2002 and 2004 while researching ClassicStar's horses. Loose inside were printouts of spreadsheets that, according to Debra, showed information on horse sales that she found on the internet. It also listed pairings that Debra said are the ones she wanted for the 2002 program.

Debra said she hadn't turned over the notebook in the nine years since the audit began because it was misfiled in Scott's office. At trial the Householders called a nanny they'd employed in 2002 to testify that it was Debra's notebook and

**[*23]** that it originally had a green cover with a picture of a horse on it. Except for its missing cover, it was in very good condition for a twelve-year-old notebook, and the notes--which bear dates spanning two years--all appear to have been written with the same type of pen. The nanny also testified that in 2002 and 2003 Debra spent a few hours each Monday through Thursday evening, as well as some weekend hours, in her home office. The nanny believed Debra was both making spreadsheets of horses and working on her schoolwork at those times.

B.    Scott's Notes

Scott also turned over handwritten notes about ClassicStar shortly before trial. He too testified that he hadn't turned them over earlier because they'd been misfiled. He had, however, previously provided a printout of a 2006 article from bloodhorse.com about the criminal case against ClassicStar on which he'd written "[d]iscuss w/ Debby." He testified that he'd discussed the article with his wife around the time it was written in 2006, but the print date in the lower right corner of the page is "9/6/2007 8:52 a.m." We do not find these late-produced materials reliable, and they reduced the credibility of the Householders' testimony on other issues.

[*24] C.    The Material Participation Log

In 2006 the Householders did turn over a participation log that covered February 2002 through December 2003.  For February 2002, they listed 3 hours each for their meeting with Holt, where they "[d]iscussed ClassicStar investment opportunities."  Between February and May they logged a total of 38 hours of research on ClassicStar and its horses.  In each of those months and in every subsequent month Debra also listed 4 hours for "[r]ead[ing] Thoroughbred Times and Blood Horse"--the magazines ClassicStar sent them a letter about in December 2002.  Starting in May 2002 Scott and Debra also listed a total of 4 hours each month for "[r]ead[ing] ClassicStar emails and articles of interest."  For twelve of the twenty-three months in the log, reading emails, articles of interest, and magazines were the only activities Scott and Debra logged.

Scott and Debra's trips make up most of the rest of the activities in the log.  Debra logged 3 hours for "[b]ook[ing] Breeder's Cup weekend" for that October 2002 trip, and 1.5 hours for "[f]irm[ing] up plans for Breeder's Cup Weekend"; and together they logged 42 hours for traveling to Kentucky, meeting ClassicStar staff, going on tours, and attending the Hawaiian-themed dinner.

They recorded a similar amount of time for their 2003 Kentucky Derby trip.  Debra logged 3 hours for planning the trip, and she and Scott together logged 58

[*25] hours for activities such as "Travel to and from Lexington," "Dinner at Embassy Suites," "Tour Kentucky Horse museum," and "mingle with other [ClassicStar] clients." For the Yellowstone trip, they logged 26 hours for travel, meeting with "other ClassicStar owners," "[a]fternoon activities with group," and discussing FEEP. And for his U.S. Virgin Islands trip, Scott logged 27.5 hours for travel, dinner meetings, and reviewing and signing documents. This all amounted to 170 hours for 2002 and 222.5 hours for 2003.

### D. The Notices of Deficiency

During the audit Scott and Debra signed several consents to extend the statute of limitations, but in 2010 the Commissioner finally sent Scott and Debra a notice of deficiency for the 2001, 2002, and 2003 tax years. It determined several adjustments for each year, though the only ones still at issue by the time of trial were 2001's $37,000 NOL carryback, 2002's $802,000 Schedule F loss; 2003's $515,000 Schedule F loss; and section 6662(a) penalties for negligence and substantial understatement for all three years. The Commissioner also sent them a notice of deficiency for the 2006 tax year. The parties have settled all of the issues it raised, but in their amended petition Scott and Debra claimed an $843,000 theft loss, and that contention remains before us.

**[\*26]** V.     Petitions and Trial

Scott and Debra filed timely petitions.  They lived in Phoenix, Arizona when they filed their petitions, and that is where we tried these cases.

Each side had expert witnesses.  The Commissioner's expert, who evaluated the pairings on the "Householder Outline of Facts," was of the opinion that the amounts Scott and Debra had paid for leasing, inseminating, and boarding mares were "grossly inflated and unwarranted."  The Householders' expert thought those amounts were reasonable, but represented "a premium."  But he didn't evaluate the same pairings--the pairings he considered were ones the Householders' lawyer told him to, and his report makes clear that his opinion was "based upon the assumption that the Householders requested the matings discussed in [his] report."

There is also a Graev issue here:  Although he determined section 6662(a) penalties in the notices of deficiency, at trial the Commissioner didn't introduce any evidence that he'd complied with section 6751(b)(1).  See Graev v. Commissioner (Graev III), 149 T.C. ___, ___ (slip op. at 13-15) (Dec. 20, 2017) (citing Chai v. Commissioner, 851 F.3d 190, 221 (2d Cir. 2017), aff'g in part, rev'g in part T.C. Memo. 2015-42), supplementing and overruling in part 147 T.C. 460 (2016).  After we released Graev III, the Commissioner moved to reopen the trial record to fix his omission for a portion of the section 6662(a) penalties; he's

[*27] conceded the rest.  We recently granted his motion and consider the Commissioner's additional evidence here.

OPINION

I.      The Parties' Arguments

Scott and Debra argue that horse breeding was a trade or business they engaged in for profit, and they also say they meet the regulatory standards for material participation.  They claim they would've made a profit if ClassicStar hadn't been a scam, and they think they should get a theft loss in 2006 because in that year they both realized they'd been swindled and determined there was no reasonable chance of getting their money back.  They also argue that they shouldn't have to pay penalties because they had reasonable cause, acted in good faith, and relied on substantial authority.

The Commissioner replies that Scott and Debra didn't materially participate in horse breeding, that their involvement with ClassicStar wasn't a trade or business, and that they shouldn't get a theft loss because the only thing they lost was impermissible tax savings.  And he says Scott and Debra should pay penalties because they knew exactly what they were doing.

**[*28]** We must therefore answer four questions:

- Did Scott and Debra materially participate in a horse-breeding activity?

- Was the horse-breeding activity a trade or business?

- Are Scott and Debra entitled to a theft loss deduction in 2006 for amounts they paid ClassicStar in 2002 and 2003?

- Are Scott and Debra liable for section 6662(a) penalties?

We address each in turn.[9]

## II. Material Participation

Taxpayers can usually deduct the ordinary and necessary expenses of carrying on a trade or business or otherwise producing income. Secs. 162(a), 212(1). But they can't deduct "passive activity" losses that exceed their "passive activity" income. Sec. 469(a), (d)(1). Passive activities include "the conduct of any trade or business * * * in which the taxpayer does not materially participate," sec. 469(c)(1), and the Code tells us that "material participation" means being

---

[9] The Commissioner also argued that the amounts of the long-term loans were never at risk, a theory Scott and Debra say the Commissioner failed to mention in his notice of deficiency. Whether those amounts were at risk doesn't affect our decisions in these cases, so we don't need to determine when the Commissioner first raised the issue or who would have the burden of proof. Scott and Debra also contest the admissibility of some exhibits the Commissioner proffered--82-R, 84-R, 85-R, 126-R, 128-R, 149-R, and 206-R. We didn't rely on those exhibits, and we will exclude them.

[*29] "involved in the operations of the activity" on a regular, continuous, and substantial basis, sec. 469(h)(1). The regulations say that a taxpayer is a material participant only if he meets one of seven enumerated tests. Sec. 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988).

Scott and Debra say they're entitled to the losses they claimed for 2002 and 2003--and the associated NOL carryback they reported on their amended 2001 return--because they satisfy two of those tests. We consider each.

A.  500 Hours

The Householders first say they satisfy the test in section 1.469-5T(a)(1), Temporary Income Tax Regs., supra, which says an individual materially participates if he "participates in the activity for more than 500 hours during * * * [the] year." Their participation log shows that together they spent only 170 hours on horse-breeding-related activities in 2002 and only 222.5 such hours in 2003. Undeterred by their own records, they point out that we may find the extent of an activity by "any reasonable means," sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), and urge us to find that Debra alone spent 500 hours a year on horse breeding because their nanny testified that in 2002 Debra spent both Monday through Thursday evenings and some weekends in her home office working on horse business.

**[\*30]** We were not persuaded.  The nanny gave only vague indications of when this practice began and ended.  She knew it started around the time Scott and Debra met with Holt in early 2002, but said that by 2003 Debra's office time "varied more" and "[i]t wasn't Monday through Thursday always necessarily." Plus she was usually taking care of the children whenever Debra was in the office and only occasionally actually saw Debra working.  The nanny also acknowledged that Debra did her schoolwork in the evenings.  Though we can use any reasonable means to estimate the hours a taxpayer spends on an activity, see Tolin v. Commissioner, T.C. Memo. 2014-65, at \* 27-\*28, we don't accept "ballpark guesstimate[s]," Jordan v. Commissioner, T.C. Memo. 2009-223, 2009 WL 3098308, at \*16, aff'd, 469 F. App'x 460 (6th Cir. 2012).  We do not find that the nanny's testimony makes it more likely than not that Debra spent at least 500 hours a year on horse-breeding-related activities--especially when Debra's own log lists less than half as much time.

> B.    Regular, Continuous, and Substantial

The Householders also argue that they satisfy the test in section 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988), which mirrors the Code by saying a taxpayer materially participates if "[b]ased on all of the facts and circumstances \* \* \* [he] participates in the activity on a regular,

[*31] continuous, and substantial basis." But an individual who tries to clutch this exception still has to spend at least 100 hours a year on related activities, see sec. 1.469-5T(b)(2)(iii), Temporary Income Tax Regs., 53 Fed. Reg. 5726 (Feb. 25, 1988)--though Scott and Debra together count as an "individual" because they're married, see sec. 1.469-5T(f)(3), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). "Management" activities, however, count toward the 100 hours only if no one else gets paid for them or spends more time on them. Sec. 1.469-5T(b)(2)(ii), Temporary Income Tax Regs., supra.

And all the material-participation tests--including the 500-hour test we discussed above--disregard work an individual does "as an investor * * * unless the individual is directly involved in the day-to-day management or operations of the activity." Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). According to the regulations, working as an investor includes "(1) [s]tudying and reviewing financial statements or reports on operations of the activity; (2) [p]reparing or compiling summaries or analyses of the finances or operations of the activity for the individual's own use; and (3) [m]onitoring the finances or operations of the activity in a non-managerial capacity." Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., supra.

Let's look at the activities that the Householders logged.

**[*32]**          1.          Initial Research

Scott and Debra's log says they spent 38 hours researching ClassicStar and 6 hours meeting with Holt to discuss "ClassicStar investment opportunities" between February and April 2002--well before they signed their first letter of intent in September 2002.  We have specifically found that research done before deciding to raise livestock doesn't count as material participation in the raising of livestock.  Syed v. Commissioner, T.C. Memo. 2017-226, at *19.  We think the same here--the Householders' initial research doesn't count--it was at best work they did as investors researching a potential investment.

2.          Reading, Talking, and Thinking

Starting in March 2002, Scott and Debra logged 4 hours a month for reading the magazines "Thoroughbred Times" and "The Blood-Horse," and starting in May they logged an additional 4 hours each month for "[r]ead[ing] ClassicStar emails and articles of interest."  They logged these hours every month until the end of 2003, and these hours constitute 72 of 170 hours for 2002 and 96 of 222.5 hours for 2003.  Almost all of the rest of the hours they logged--46.5 hours in 2002 and 111.5 hours in 2003--were spent planning and going on trips.  During these trips, they logged hours for so-called breakfast meetings, lunch meetings, and dinner meetings--including the one with a Hawaiian theme; touring

**[*33]** ClassicStar's facilities; watching the Kentucky Derby; and talking to other ClassicStar clients. The remaining hours in their log show initial research, viewing ClassicStar materials, or reviewing contracts.

None of these activities are the day-to-day management or operation of a horse-breeding business. While Scott and Debra were doing them, other people far away were supposedly taking care of the horses they'd purportedly leased and making the day-to-day decisions about their care. See Lapid v. Commissioner, T.C. Memo. 2004-222, 2004 WL 2244500, at *4 (owner of hotel rooms didn't materially participate where someone else cleaned and checked people in).

What's more, we've previously said that the types of activities Scott and Debra logged are not material participation. In Syed, at *5, a putative rancher logged hours for "reading magazines about animal husbandry, talking with other ranchers, and thinking about ranch matters." There we explained that "reading, talking, and thinking" don't count as material participation if other people are doing the actual work. See id. at *22. They don't count here, either. At best, the activities which the Householders logged were things investors might do to monitor an investment.

**[*34]**     3.     <u>Management</u>

Scott and Debra nevertheless argue that these activities should count as material participation.  They say they alone managed their horse-breeding operation because they decided how much to spend, selected pairings, and authorized veterinary care for Phoenix Heat.  But Phoenix Heat wasn't born until 2004, and Debra didn't see her until 2005, so any involvement they had with her wasn't material participation in 2002 and 2003.  Plus we aren't convinced that they actually selected thoroughbred pairings--they signed contracts that didn't list any horses, signed a schedule A that listed nonthoroughbreds and a gelding, and their "Outline of Facts" and Debra's late-produced notebook aren't consistent about which pairings she purportedly requested orally.  And deciding how much to spend sounds a lot like an investment activity.

Even if we counted all these things, it still wouldn't help Scott and Debra.  Section 1.469-5T(k), <u>Example</u> (<u>8</u>), Temporary Income Tax Regs., 53 Fed. Reg. 5728 (Feb. 25, 1988), says that someone who owns an interest in a cattle business and periodically makes unilateral decisions about feeding and selling the cattle doesn't satisfy the test in section 1.469-5T(a)(7), Temporary Income Tax Regs., 53 Fed. Reg. 5725 (Feb. 25, 1988), where someone else receives income for managing the cattle's day-to-day care.  Changing "cattle" to "mares" in this

[*35] example gives us something very close to Scott and Debra's version of events--even if we assume they made the financial and breeding decisions, ClassicStar still managed the day-to-day care. Scott and Debra's decisionmaking, we find, doesn't count as material participation.

### C. Principal Purpose

We note as well that the regulations say that hours spent on an activity don't count toward material participation if "[o]ne of the principal purposes for the performance of such work is to avoid the disallowance, under section 469 and the regulations thereunder, of any loss or credit from such activity." Sec. 1.469-5T(f)(2)(i)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5726-5727 (Feb. 25, 1988). The evidence here shows ClassicStar repeatedly told the Householders to read magazines and emails, listen to talks, and take trips. We agree that the Householders followed those instructions and did all these things--but only because they wanted the losses ClassicStar sold them. Virtually every hour they spent was done to show material participation so they could avoid disallowance of losses, which means those hours don't count toward material participation.

The Householders didn't spend 500 hours a year breeding horses, they didn't handle any day-to-day operations or management, and they did what they did just to avoid disallowance of their deductions. That means their involvement

**[\*36]** with ClassicStar's mare-leasing program was a passive activity, and their passive losses are allowable only to the extent that they have passive income.

III.     Trade or Business

Even if Scott and Debra did materially participate in a horse-breeding operation, we have another reason for disallowing their horse-breeding deductions.  Section 162(a) permits deductions for ordinary and necessary expenses paid or incurred "in carrying on any trade or business," but an activity is a trade or business only if a taxpayer does it continuously and regularly with the honest intent of making a profit.  Commissioner v. Groetzinger, 480 U.S. 23, 35 (1987); see also sec. 183(a), (c).  Section 212 allows a taxpayer to deduct expenses incurred in the production of income generally, but again only if he actually intends to make a profit.  See Bolaris v. Commissioner, 776 F.2d 1428, 1432 (9th Cir. 1985), aff'g in part, rev'g in part 81 T.C. 840 (1983); Allen v. Commissioner, 72 T.C. 28, 33 (1979); see also sec. 183(a), (c).  A taxpayer's profit expectation doesn't have to be reasonable, but it does have to be genuine.  See Dreicer v. Commissioner, 78 T.C. 642, 645 (1982), aff'd without published opinion, 702 F.2d 1205 (D.C. Cir. 1983); Metz v. Commissioner, T.C. Memo. 2015-54, at \*3; sec. 1.183-2(a), Income Tax Regs.

**[\*37]** Taxpayers bear the burden of showing they had a profit motive. <u>Wolf v. Commissioner</u>, 4 F.3d 709, 713 (9th Cir. 1993), <u>aff'g</u> T.C. Memo. 1991-212. And "profit" means economic profit--not tax savings. <u>Id.</u>; <u>Surloff v. Commissioner</u>, 81 T.C. 210, 233 (1983). Did the Householders intend to make a profit breeding horses?

The regulations tell us to determine taxpayers' subjective intent to make a profit "by reference to objective standards, taking into account all of the facts and circumstances." Sec. 1.183-2(a), Income Tax Regs. They give us nine factors to consider, but tell us that "[n]o one factor is determinative," that we can consider factors not on the list, and that we shouldn't simply compare the number of factors that suggest a profit motive to the number of factors that don't. Sec. 1.183-2(b), Income Tax Regs. The Seventh Circuit has called this "a goofy regulation" and has said we'd be better off if, instead of "wading through the nine factors," we took a more holistic approach to determining whether a taxpayer intended to turn a profit. <u>Roberts v. Commissioner</u>, 820 F.3d 247, 250, 254 (7th Cir. 2016), <u>rev'g</u> T.C. Memo. 2014-74. It did something like that in a recent opinion in a horse-breeding case. <u>See</u> <u>Estate of Stuller v. United States</u>, 811 F.3d 890, 896-98 (7th Cir. 2016). But the cases before us are appealable to the Ninth Circuit, so we'll screw in our calks and into the mud we go.

**[\*38]** A.    Manner in Which the Activity Is Conducted

The first factor tells us to look at how the taxpayer conducts the activity.  It says: "The fact that the taxpayer carries on the activity in a businesslike manner and maintains complete and accurate books and records may indicate that the activity is engaged in for profit."  Sec. 1.183-2(b)(1), Income Tax Regs.  Scott and Debra say they were businesslike because they researched ClassicStar, formed an LLC and got it a bank account, maintained an activity log, and had a business plan--not a written one, but one whose existence we should infer from their actions.  They also rely on a participation log that simply lists activities ClassicStar told them to list and handwritten notes they say they'd misfiled for nine years and fortuitously discovered only on the eve of trial.  Their administration of the LLC was hardly businesslike--they kept few records for it, and they used its bank account to pay personal bills such as payments on their Land Rover.

Also unbusinesslike for people engaged in horse breeding was Scott's and Debra's apparent uninterest in whether their horses got pregnant.  Least businesslike of all is their signing up for thoroughbred horse breeding purportedly worth $802,000 in 2002 and $500,000 in 2003 without knowing what horses they were paying to breed.  For the 2002 program they signed contracts that referred to

**[*39]** but didn't actually contain a schedule of horses, and for the 2003 program they signed a schedule that listed quarter horses and a gelding. And even if there was a "verbal schedule A" or an oral agreement about placeholders or tradeouts-- which we doubt--the contracts themselves said any prior agreements were invalid and said subsequent agreements were valid only if written. Signing such contracts was, under the circumstances, decidedly unbusinesslike.

This factor weighs against Scott and Debra.

B.    Expertise of Taxpayers or Advisers

Consulting with experts when preparing for an activity can suggest a profit motive. Sec. 1.183-2(b)(2), Income Tax Regs. Scott and Debra say they consulted extensively with two experts--themselves. They point out that Scott was a successful businessman and that Debra spent time with horses in her youth. But neither Scott nor Debra had any experience breeding thoroughbreds. Scott's background was in finance; and although a young Debra bred her show horse Brandy Susie Bar twice, she managed to sell only one foal, and only for the amount of the stud fee. These experiences did not turn them into thoroughbred-breeding experts. And they can't claim reliance on Holt or ClassicStar because they were the ones selling them the program. See Romanowski, at *34-*35; Pederson, at *42. This factor weighs against them.

**[\*40]** C.    <u>Time and Effort Expended on the Activity</u>

"The fact that the taxpayer devotes much of his personal time and effort to carrying on an activity, particularly if the activity does not have substantial personal or recreational aspects, may indicate an intention to derive a profit." Sec. 1.183-2(b)(3), Income Tax Regs. Scott and Debra argue that in addition to the activities they recorded on their material participation log Debra spent "countless hours * * * researching yearling sales information" for ClassicStar's horses. But that argument relies on the nanny's unpersuasive testimony. <u>See</u> <u>supra</u> p. 30.

Even the material-participation log fails to show devotion of much personal time and effort. Close to half of the hours were logged for reading emails, articles, and magazines, and these were the only activities for about half the months in the log. Reading magazines doesn't show time and effort spent managing a horse-breeding business, and we have our doubts about how much time Debra actually spent reading them--nothing about the log suggests that entries in it were made contemporaneously with the activities recorded; and although Debra started logging magazine hours in March 2002, she didn't get information about the magazines from ClassicStar until December of that year. Most of the rest of the time was spent on trips to the Breeders' Cup, the Kentucky Derby, Yellowstone,

**[*41]** and the Virgin Islands--each of which included large dollops of recreation. This factor also weighs against them.

D. Expectation That Assets Used in Activity May Appreciate

An expectation that assets will appreciate can suggest a profit motive. Sec. 1.183-2(b)(4), Income Tax Regs. The Householders claim they expected to receive and sell several foals, but the documents they reviewed and signed tell a different story. The initial reports from ClassicStar show only losses, not profits. Based on those reports, Scott and Debra decided to participate, signed the 2002 contracts not knowing what horses they were supposedly breeding, and signed a schedule A for 2003 that included quarter horses and a gelding. And they knew all along that they'd be able to exchange their mare-leasing interest for participation in FEEP and Gastar, which also suggests that they weren't really interested in making money from horses. Deductible losses, not profitable foals, are what they expected. This factor weighs against them.

E. Taxpayers' Success in Similar Activities

"The fact that the taxpayer has engaged in similar activities in the past and converted them from unprofitable to profitable enterprises may indicate that he is engaged in the present activity for profit." Sec. 1.183-2(b)(5), Income Tax Regs. The Householders point out that Scott ran an extremely successful financial

[*42] advisory business and that Debra had experience with horses. But Scott had no experience with thoroughbred breeding--although he testified that he did "due diligence" on ClassicStar, he said Debra was the horse expert. See Annuzzi v. Commissioner, T.C. Memo. 2014-233, at *26 (taxpayer's success in concrete business doesn't show profit motive for thoroughbred activities). Debra also lacked any experience as a manager of a breeding business--her horse experience was hands-on and during her youth. And her two attempts at breeding her own horse were commercial failures. This factor weighs against them.

     F.     History of Income or Losses With Respect to the Activity

Long periods of losses following the initial startup phase can indicate the lack of a profit motive. Sec. 1.183-2(b)(6), Income Tax Regs. The Householders argue that their 2002 and 2003 losses were basically startup costs because they expected to receive the 2002 program's foals in 2004 and sell them in 2005. They also say we shouldn't count their continued losses against them because they would've made money if ClassicStar had been on the level.

It's true that many businesses are unprofitable at first, and many also fail without ever making money. But as we've already pointed out, the documents Scott and Debra based their participation on show that they didn't expect economic profits--they expected only losses, and in amounts that would entirely

[*43] offset their income. See supra p. 41. They can't now argue that they would've made money but for ClassicStar's criminality when they never planned to make money to begin with. This factor counts against them.

G.     Amount of Occasional Profits, If Any

Occasional profits can show a profit motive, but the size and frequency of profits relative to losses are what matter. Sec. 1.183-2(b)(7), Income Tax Regs. "[S]ubstantial profit, though only occasional" is therefore a better indicator of a profit motive than "occasional small profit from an activity generating large losses." Id. Scott and Debra say this factor should count in their favor because there was a small chance they'd make big money breeding horses. Once again, we reject this argument because the record shows that losses, not profits, motivated their involvement with ClassicStar. And the only horse-breeding revenue they received was the $180,000 they got from the 2005 sale of Phoenix Heat, which was occasional and small compared to the $1.3 million they claim to have spent in 2002 and 2003. This factor also weighs against them.

H.     The Taxpayers' Financial Status

"Substantial income from sources other than the activity (particularly if the losses from the activity generate substantial tax benefits) may indicate that the activity is not engaged in for profit." Sec. 1.183-2(b)(8), Income Tax Regs. In

[*44] 2002 Scott and Debra reported $445,000 of income from the Householder Group and $196,000 of COI income, and in 2003 they reported $420,000 of business income. But thanks to the losses they reported from their involvement with ClassicStar, they reported zero taxable income for each of those years--and realized substantial tax benefits as a result.

Scott and Debra say that horse breeding was Debra's business and that we should consider only her portion of their income when weighing this factor. But by filing jointly they enjoyed the tax losses together. And their log credits Scott with 121.5 of the hours, and only he went to the ClassicStar event in the U.S. Virgin Islands. Scott and Debra together offset huge joint income with purported joint losses from their joint involvement with ClassicStar. This factor weighs very heavily against them.

### I.      Elements of Personal Pleasure or Recreation

"The presence of personal motives in carrying on of an activity may indicate that the activity is not engaged in for profit, especially where there are recreational or personal elements involved." Sec. 1.183-2(b)(9), Income Tax Regs. Scott and Debra admit that Debra loved horses, yet they argue that personal pleasure wasn't a motive here because Debra didn't spend time with them--after all, she was in Arizona, and the horses were in Kentucky. Pointing out that Debra was thousands

**[\*45]** of miles from her horses is a curious way to argue that she was engaged in a real horse-breeding business. More to the point, 160 of the hours in Scott and Debra's participation log are from trips--to the Breeders' Cup, the Kentucky Derby, Yellowstone, and the U.S. Virgin Islands. And the activities listed on these trips are almost all recreational--tours, lunches, and dinners. Recreation was a large part of Scott and Debra's involvement with ClassicStar, so this factor counts against them.

This is not a case where slogging through the "goofy" regulation would ever lead to a result different from taking a "holistic" approach. The regulatory factors together show that the Householders got involved with ClassicStar with the intent to generate losses, not profits. The documents ClassicStar sent them before each breeding season showed them how to offset the income they expected from other sources. They signed a 2002 contract not knowing what horses they were leasing, and they signed a 2003 schedule of horse pairings that included quarter horses and a gelding. The activities they logged were largely recreational. And from the beginning they knew they'd be able to convert their mare-leasing interests into stakes in related entities--some of which they later used to satisfy their NELC loans. Looked at all together, we find that what they wanted from their horse-breeding activity was tax savings to offset their large income from other sources.

**[\*46]** They lacked a subjective intent of making a profit.  See Wolf, 4 F.3d at 713; Surloff, 81 T.C. at 233.  Scott and Debra's purported horse-breeding activity was not a trade or business.

IV.   Theft Loss

The Householders argue that even if they didn't materially participate in a horse-breeding business they can still deduct as a theft loss any amounts they gave to ClassicStar but didn't get back.  See sec. 165(a), (c)(3).  To deduct a theft loss, a taxpayer has to show by a preponderance of the evidence that theft or something similar under state law caused the loss.  See, e.g., Monteleone v. Commissioner, 34 T.C. 688, 692-93 (1960); see also sec. 1.165-8(d), Income Tax Regs. ("theft" includes larceny, embezzlement, and robbery).  The taxpayer also has to show the year in which he discovered the loss, which becomes the year he can claim the deduction as long as there's no reasonable chance of recovery.  See sec. 165(e); sec. 1.165-8(a)(2), Income Tax Regs.  And of course he has to show the amount of the loss.  See sec. 1.165-8(c), Income Tax Regs.; see also, e.g., Elliot v. Commissioner, 40 T.C. 304, 313 (1963).

The Householders say that the federal criminal convictions of David Plummer, Spencer Plummer, and Terry Green show that ClassicStar committed theft by deception under Kentucky law.  They also say they discovered the loss in

[*47] 2006, when ClassicStar was raided, and in the same year determined that there was no hope of recovery. In their opening brief they argue that they paid $700,000--an amount that includes what they gave ClassicStar directly, the principal and interest they paid on the short-term loans, and the interest they paid on the long-term loans, but not the long-term loan principal they satisfied through FEEP--but got back only $180,000 from selling Phoenix Heat, leaving them with a $520,000 loss.

The Commissioner doesn't contest the amount the Householders paid, but he says there was no loss. He points out that in addition to the $180,000 for Phoenix Heat, the Householders received 75,000 shares of Gastar stock. They exchanged part of their mare-leasing interest for these shares on the same day they traded for their FEEP units--December 31, 2004. The parties stipulated that Gastar stock traded at $16 at the end of 2004, which made these shares worth $1.2 million. And at the end of 2006--the year for which the Householders claimed a theft loss--Gastar still traded at $10.75 a share, which made their shares worth $803,000. ClassicStar didn't steal from Scott and Debra--it gave them assets worth more than they'd paid.

Scott and Debra acknowledge that they received the Gastar stock. They point out, however, that they weren't allowed to sell it for one year without

**[\*48]** Gastar's permission, and they say that even though they signed the purchase agreements in December 2004, this restriction was still in effect at the end of 2006 because they didn't actually receive the shares until "[s]ometime after" April of that year.[10]  They now ask us to find a marketability discount for this restriction and determine that they still had a loss.

Scott and Debra didn't present any expert testimony or other evidence that would enable us to accurately determine a marketability discount for restricted Gastar shares.  They instead ask us to make a finding based on questionable inferences.  First, they say that because the 2004 purchase agreements allocated $3 to each Gastar share, we should find that $3 was the fair market value of a restricted share at that time.  Gastar was trading at $16 then, meaning the marketability discount they want is over 80%.  Next they say that because the

---

[10] The purchase agreements had boilerplate clauses stating that the shares weren't registered, that Scott and Debra received them only under the accredited-investor exemption, see Small Business Investment Incentive Act of 1980, Pub. L. No. 96-477, sec. 602, 94 Stat. at 2294 (codified as amended at 15 U.S.C. sec. 77d(a)(5) (2016)); see generally Wright v. Nat'l Warranty Co., 953 F.2d 256, 259-60 (6th Cir. 1992), and that they cannot sell them unless the shares got registered or an exception to registration applies.  But the record also shows that Gastar was publicly traded--the parties stipulated to Gastar's share-price history and introduced Gastar's 2005 annual report, which says that its shares were listed on the American and the Toronto Stock Exchanges.  These facts overcome the boilerplate clauses and lead us to find that they do not affect the value of the shares.

**[*49]** value of unrestricted Gastar stock dropped about 33% from the end of 2004 to the end of 2006, the value of restricted shares would've fallen by the same percentage, making them worth just $2.[11]

To make this finding we'd have to assume that the allocation on the purchase agreement between the Householders and ClassicStar accurately valued the stock. We won't make that assumption. Scott and Debra entered into agreements with ClassicStar that arbitrarily valued mare leases and related expenses, and there's no reason to think the allocation here is any more reliable. We'd also have to assume that the marketability discount rate didn't fluctuate over time, and we'd have to ignore the fact that on their November 29, 2007, bankruptcy proof of claim Scott and Debra valued the stock--which they said on the claim they still hadn't received--at $4.84 a share, only 9% less than the $5.30 it was trading for that day. We won't do that, either.

More importantly, the Householders raised the issue of the Gastar stock's marketability for the first time in their reply brief, and we don't let parties raise new issues or theories on brief when doing so would surprise and prejudice the other side. See Smalley v. Commissioner, 116 T.C. 450, 456 (2001); Seligman v.

---

[11] They didn't do the calculation, but this would make their purported loss only $370,000--the $520,000 they claim minus the $150,000 they now say their shares were worth.

[*50] Commissioner, 84 T.C. 191, 198-99 (1985), aff'd, 796 F.2d 116 (5th Cir. 1986). A party is prejudiced if it would need to present additional evidence to respond to the new issue or theory. See Pagel, Inc. v. Commissioner, 91 T.C. 200, 212 (1988), aff'd, 905 F.2d 1190 (8th Cir. 1990). To respond to the marketability-discount theory, the Commissioner would have to amass evidence of what restricted Gastar shares were worth. His lack of opportunity to do so would prejudice him. We therefore won't consider it.

Scott and Debra didn't lose the money they paid ClassicStar, so they didn't suffer a theft loss.

V.     Penalties

The Commissioner determined section 6662 penalties against Scott and Debra for 2001, 2002, and 2003. That section imposes a 20% penalty on understatements that are substantial, see sec. 6662(b)(2), (d), or that are due to negligence or disregard of rules and regulations, see sec. 6662(b)(1), (c). When the taxpayers are individuals, the Commissioner has the initial burden of production for penalties. Sec. 7491(c). He meets part of his burden for substantial-understatement penalties here because Scott and Debra's understatements are more than $5,000 and more than 10% of the tax they should've reported each year. See sec. 6662(d)(1)(A). He meets the initial part of

[*51] his burden for negligence too because he showed, and we so find, that Scott and Debra should've known that their return position--which offset all of their income with horse-leasing expenses prepaid with sham loans--was too good to be true, and they made no real effort to ascertain the correctness of that position. See sec. 1.6662-3(b)(1)(ii), Income Tax Regs.

A.    Reasonable Cause and Good Faith

Scott and Debra say they're not liable for penalties because they had reasonable cause for their return position and acted in good faith when they took it. See sec. 6664(c)(1); sec. 1.6664-4(b)(1), Income Tax Regs. They argue that three things show their reasonable cause and good faith: They relied on a CPA, they relied on Holt and PCG's materials, and they conducted their horse-breeding endeavor in a businesslike manner. We've already held that their conduct was not businesslike, see supra pp. 38-39, so we address only the first two contentions.

Reasonable reliance on an adviser such as a CPA can excuse a taxpayer from an accuracy-related penalty. Neonatology Assocs., P.A. v. Commissioner, 115 T.C. 43, 98 (2000), aff'd, 299 F.3d 221 (3d Cir. 2002). Reliance is reasonable if:

- the adviser was a competent professional with sufficient expertise to justify reliance;

[*52] ● the taxpayer provided necessary and accurate information to the adviser; and

● the taxpayer actually relied on the adviser's judgment in good faith.

Id. at 99. Scott and Debra point out that they discussed their ClassicStar participation with Stallworthy, their CPA, and the Commissioner doesn't dispute that she was a competent professional. But Stallworthy refused to give them an opinion. She also didn't come up with Scott and Debra's return position--she merely filled out their returns using numbers Scott gave her, and only after he assured her that he and Debra materially participated. Far from relying on their CPA's advice, Scott and Debra told her what to do. That doesn't protect them. See, e.g., Bronson v. Commissioner, T.C. Memo. 2012-17, 2012 WL 129803, at *12-*13, aff'd, 591 F. App'x 625 (9th Cir. 2015); Kaplan v. Commissioner, T.C. Memo. 2006-16, 2006 WL 265878, at *23.

Next they say that they reasonably relied on the opinion letter in the PCG materials that Holt gave Scott. But the Householders can't claim reliance on Holt because commissions he received for placing people with ClassicStar make him a promoter--someone "who participated in structuring the transaction or is otherwise related to, has an interest in, or profits from the transaction." 106 Ltd. v. Commissioner, 136 T.C. 67, 79 (2011) (quoting Tigers Eye Trading, LLC v.

[*53] Commissioner, T.C. Memo. 2009-121, 2009 WL 1475159, at *19), aff'd, 684 F.3d 84 (D.C. Cir. 2012).  Scott knew Holt was getting commissions for placements with ClassicStar, and he knew Holt was placing multiple people in the same program--another hallmark of a promoter.  See id. at 80.  No reasonable reliance there, either.

B.      Substantial Authority

Scott and Debra also say they shouldn't have to pay penalties because they had substantial authority for their return position.  Substantial authority is not a defense to negligence; it's a defense only to substantial understatements.  See sec. 1.6662-4(d)(3)(iii), Income Tax Regs.  And the tax opinion they got from Holt-- which is the only thing they say they relied on--doesn't excuse their understatement because "opinions rendered by tax professionals are not authority." Id.  This argument also fails.

C.      Section 6751

Part of the Commissioner's burden of production on penalties is showing that they were "personally approved (in writing) by the immediate supervisor of the individual making such determination."  See sec. 6751(b)(1); Graev III, 149 T.C. at ___ (slip op. at 14).  The Commissioner didn't introduce any evidence of such approval at trial, but we recently granted his motion to reopen the trial record

[*54] and added to it penalty-approval forms for the 2002 and 2003 negligence penalties. These are enough for the Commissioner to meet this part of his burden of production for the 2002 and 2003 negligence penalties, and he's conceded any others.[12] So, we sustain the section 6662 penalties for Scott and Debra's 2002 and 2003 tax years and, despite their lack of reasonable cause or good faith, we don't sustain the section 6662(a) penalties for their 2001 tax year.

Decisions will be entered under

Rule 155.

---

[12] More specifically, the Commissioner's conceded the 2001 negligence penalty and the 2001, 2002, and 2003 substantial-understatement penalties.